UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

FRANCIE S. HOWELL,

        Plaintiff,

v.                                   Case No.  5:04-cv-254-Oc-10GRJ

JO ANNE B. BARNHART,
Commissioner of Social Security,

        Defendant.
_____/

## REPORT AND RECOMMENDATION[1]

Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for a period of disability and disability insurance benefits.  (Doc. 1.)  The Commissioner has answered (Doc. 8), and both parties have filed briefs outlining their respective positions.  (Docs. 14 & 17.)  For the reasons discussed below, the Court finds that the Commissioner's decision is due to be **REVERSED and REMANDED**.

## I.  PROCEDURAL HISTORY

Plaintiff filed an application for a period of disability and disability insurance benefits on October 17, 2001, alleging a disability onset date of May 4, 1999.  (R. 64-66.)  Plaintiff's application was denied initially (R. 29-31) and upon reconsideration.  (R. 34-35.)  Plaintiff requested a hearing before an Administrative Law Judge, which was held on November 20, 2003.  (R. 383-424.)  On January 27, 2004, following the hearing,

---

[1]Specific written objections may be filed in accordance with 28 U.S.C. § 636, and Rule 6.02, Local Rules, M.D. Fla., within ten (10) days after service of this report and recommendation.  Failure to file timely objections shall bar the party from a *de novo* determination by a district judge and from attacking factual findings on appeal.

Administrative Law Judge Philemina M. Jones (the "ALJ") issued a decision unfavorable to Plaintiff.  (R. 14-20.)  Plaintiff's request for review of that decision was denied by the Appeals Council on April 23, 2004, rendering the ALJ's decision the final decision of the Commissioner.  (R. 7-9.)  On June 22, 2004, Plaintiff filed the instant appeal to this Court of the Commissioner's final decision.  (Doc. 1.)

## II. ISSUES PRESENTED

Plaintiff argues that the ALJ failed to adequately consider her mental impairments and the functional limitations associated therewith.  Specifically, Plaintiff contends that the ALJ inappropriately gave more weight to the opinions of non-examining state agency physicians and a psychologist selected for a single consultative examination by the Commissioner than to the opinions of Plaintiff's treating physicians.  Additionally, Plaintiff alleges that the ALJ failed to fulfill her duty to complete the record by not obtaining an updated consultative mental examination.  In response, the Commissioner maintains that the ALJ's decision was supported by substantial evidence and that it is within the ALJ's discretion whether additional evidence is needed in order to make a decision

## III. STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[2]  Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such

---

[2] See 42 U.S.C. § 405(g).

relevant evidence as a reasonable person would accept as adequate to support the conclusion.[3]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[4]  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[5]  However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[6]

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[7]  The impairment must be severe, making

---

[3] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); accord, Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[4] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[5] Foote, 67 F.3d at 1560; accord, Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

[6] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[7] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505 (2003) (All further references to 20 C.F.R. will be to the 2003 version unless otherwise specified.).

Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[8]

The ALJ must follow five steps in evaluating a claim of disability.[9]  First, if a claimant is working at a substantial gainful activity, she is not disabled.[10]  Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.[11]  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.[12]  Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled.[13]  Fifth, if a claimant's impairments (considering her residual functional capacity ("RFC"), age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.[14]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[15]  The burden then temporarily shifts to the Commissioner

---

[8] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[9] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[10] 20 C.F.R. § 404.1520(b).

[11] 20 C.F.R. § 404.1520(c).

[12] 20 C.F.R. § 404.1520(d).

[13] 20 C.F.R. § 404.1520(e).

[14] 20 C.F.R. § 404.1520(f).

[15] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987). See also Doughty v. Apfel, 245 F. 3d 1274, 1278 (11th Cir. 2001).

to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[16]   The Commissioner may satisfy this burden by pointing to the Grids for a conclusive determination that a claimant is disabled or not disabled.[17]

However, the ALJ should not exclusively rely on the grids when "the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion."[18]   In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[19]

The ALJ may use the grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[20]   Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such

---

[16] Doughty, 245 F.3d at 1278 n.2 ("In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.") (Internal citations omitted).

[17] Walker, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.")

[18] Wolfe v. Chater, 86 F.3d 1072, 1077 ( 11th Cir. 1996).  See Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker, 826 F.2d at 1003 ("the grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation").

[19] Walker, 826 F.2d at 1003.

[20] Wolfe, 86 F.3d at 1077-78.

evidence.[21]  Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.[22]

## IV.  SUMMARY OF THE RECORD EVIDENCE

Plaintiff, born on October 2, 1947, was 56 (fifty-six) years old at the time of the ALJ's decision. (R. 390.)  She completed high school and one year of college courses. (R. 391.)  In the fifteen years prior to the ALJ's decision, Plaintiff held three separate jobs. (R. 87.)  Most recently Plaintiff worked for a temporary employment agency as a data clerk in 1998 and 1999. (*Id.*)  Her work included data entry, filing, and opening mail and was mostly performed while sitting.  (R. 88.)  Between 1993 and 1997, Plaintiff worked for a bio-technology corporation as an office manager, a job that required sitting for six hours per day and no lifting or carrying.  (R. 87.)  Her duties in that position mainly involved typing and ordering office supplies.  (R. 392.)  Prior to that, from 1985 to 1993, Plaintiff worked for IBM as a Senior Administrative Analyst, another job that required her to sit for six hours per day, but not to lift or carry any weight.  At IBM, she worked at a centralized headquarters and provided support to branch offices over the telephone for issues involving customers' bills. (R. 393.)

Plaintiff claims that she became unable to work on May 4, 1999 due to an inability to operate a telephone, and the general inability to think quickly or to think about more than one thing at a time.  (R. 78, 394.)  Specifically, Plaintiff contends that at

---

[21] See id.

[22] See Doughty, 245 F.3d at 1278 n.2.

times she cannot understand conversations on the telephone, remember what is said to her through the telephone, or recognize voices over the telephone.  (R. 78.)  Plaintiff alleges that these conditions rendered her unable to work because her past work requires use of the telephone and communication with peers, which she cannot do. (*Id.*)  Plaintiff states that she stopped working because she could not understand the duties required of her, became easily confused, and could not complete even simple administrative tasks.  (*Id.*)

 As this appeal concerns Plaintiff's alleged mental impairments and their effects on her ability to work, the Court's discussion of the medical evidence will be limited to those portions of the medical record relevant to Plaintiff's mental condition.

The earliest mention of Plaintiff's difficulties with the telephone occurs in the June 18, 1999 treatment notes from Carilion Family Medicine-Burnt Chimney ("Carilion").  (R. 143.)  At that time Plaintiff complained that she could not concentrate when she picked up a telephone receiver.  (*Id.*)  Plaintiff reported that her concentration and mid-term memory had decreased.  (*Id.*)  Additionally, Plaintiff complained of anhedonia,[23] insomnia, decreased appetite, and decreased sexual desire.  (*Id.*)  On December 8, 1999 she reported that she was experiencing frequent migraines.[24]  (R. 142.)  Plaintiff returned on January 21, 2000 and reported that she had experienced four to five

---

[23] Anhedonia is a marked decrease in the pleasure of living or of being alive.  1-A Attorneys' Dictionary of Medicine 7266.

[24] A migraine is a type of headache characterized by periodic recurrence, tendency to affect one side of the head, nausea, vomiting, visual disturbances, etc.  4-M Attorneys' Dictionary of Medicine 4642.

migraines in the past three weeks but that the use of Imitrex[25] provided relief.  At that time Plaintiff reported that her confusion was worsening, and that she could not identify the person on the other end of a phone call, even members of her family.  (R. 142.) She complained that she would have recurrent confusion episodes and could not understand some conversations.  (*Id.*)  Additionally, she complained that she had become more forgetful.  (*Id.*)  At that time, her medications included Synthroid[26] and Zoloft.[27]  (*Id.*)

Treatment notes dated  August 18, 1999, disclose that Plaintiff stated that her headaches had become very mild and less frequent.  (R. 141.)  Further, she reported that her feelings of depression had improved since she began taking Zoloft, and the treatment notes reflected that her depression was stable.  (*Id.*)  The notes from October 5, 2000 reveal that Plaintiff underwent an electroencephalogram ("EEG") that showed signs of simple partial seizures.[28]  (R. 135.)  However, she already felt relief from the

---

[25] Imitrex is the brand name of a preparation containing sumatriptan succinate. 3-I Attorneys' Dictionary of Medicine 759.  Sumatriptan succinate is a drug (serotonin antagonist) used for the treatment of migraine headaches.  5-S Attorneys' Dictionary of Medicine 8196.

[26] Synthroid is the trademark name of a medicine used to treat hypothyroidism.  5-S Attorneys' Dictionary of Medicine 9640.  Hypothyroidism is the condition resulting from a deficiency in activity of the thyroid gland.  When the deficiency occurs in adult life, the resulting condition is called myxedema.  It is characterized by slowness of the mind, puffiness of the face and hands, wax-like appearance of the skin, etc. 3-H Attorneys' Dictionary of Medicine 6035.

[27] Zoloft is the trademark name of a medicine containing sertraline hydrochloride, used to relieve mental depression.  6-Z Attorneys' Dictionary of Medicine 185.

[28] A simple partial seizure is a form of epileptic seizure initially involving one half of the brain and not associated with an impairment of consciousness.  5-S Attorneys' Dictionary of Medicine 3473.

seizures after she began taking Neurontin[29] the week before.  (*Id.*)  Also, the notes from that date reflect that Plaintiff had begun taking Depakote.[30]  (*Id.*)

On March 9, 2001, Plaintiff was treated by Dr. Nordeli Estronza, a neurologist, for a neurological follow-up.  (R. 241.)  Dr. Estronza found that Plaintiff's migraines were under good control with Depakote, that her EEG was abnormal, and that she had cognitive deficits, possibly in the form of pseudo-dementia.[31]  After a May 16, 2001 evaluation, Dr. Estronza again reported that the migraines were under good control. (Doc. 182.)  Additionally, Dr. Estronza noted that Plaintiff recently had undergone extensive neurological testing that excluded a neurodegenerative illness as the cause of her selected difficulty in answering the phone.  (*Id.*)  On October 10, 2001, Dr. Estronza reported that Plaintiff's migraines were under good control using Topamax.[32]  (R. 200.) Although he was uncertain Dr. Extronza opined that an abnormal EEG could be related to Plaintiff's history of migraines.  (*Id.*)  Also, Dr. Estronza noted that an MRI of Plaintiff's brain was unrevealing, and extensive serological tests performed on Plaintiff showed normal results.  (*Id.*)  In subsequent return visits, in January and March 2002, Dr. Estronza found that the migraines remained under good control, but also found a possibility of early Alzheimer's disease.  (R. 239-40.)

---

[29] Neurontin is a drug used in the treatment of partial seizures in patients with epilepsy.  4-N Attorneys' Dictionary of Medicine 1964.

[30] Depakote is the trademark name of a medicine used in the treatment of absence seizures (clouding of consciousness).  2-D Attorneys' Dictionary of Medicine 1448.

[31] Pseudodementia is a condition resembling dementia (mental deterioration) marked by extreme indifference to one's surroundings, but without deterioration of the mind or the intelligence.  5-P Attorneys' Dictionary of Medicine 2053.

[32] Topamax is the trademark name of a drug used in adults and children as an antiepileptic agent. 6-TH-TZ Attorneys' Dictionary of Medicine 18.

Dr. Estronza referred Plaintiff to Jeffrey B. Luckett, Ph.D., who saw Plaintiff on March 26, April 1, and April 12, 2001, for a "Neuropsychological/Memory/Psychological Evaluation," in an attempt to ascertain the reasons for her confusion and memory difficulties.  (R. 243-54.)  Dr. Luckett observed no evidence of a psychotic disorder, delusional system, or autistic logic.  (R. 245.)  Plaintiff showed no evidence of immediate, short-term, or long-term memory impairment on interview or in her testing. (*Id.*)  However, Dr. Luckett did find evidence of attention and concentration difficulties. (*Id.*)  Additionally, Dr. Luckett found evidence of depression and anxiety difficulties, as well as a strong somatic[33] preoccupation with ongoing physical concerns in regard to her daily functioning.  (*Id.*)  Upon completing psychological testing, Dr. Luckett observed that Plaintiff presented a picture of ruminative[34] self-doubt with excessive worry, somatic preoccupation, physiological anxiety, and probable underlying depression.  (R. 253.) Together, Dr. Luckett concluded, Plaintiff's severe psychological difficulties were likely having a negative impact upon her attention and concentration abilities and could be resulting in a subjective belief in neurocognitive compromise.  (*Id.*)  However, Dr. Luckett saw no evidence of dementia in Plaintiff.  (*Id.*)  Dr. Luckett diagnosed

---

[33] Somatic means pertaining to the body.  The word is used in two senses: pertaining to the body as distinguished from the mind, and pertaining to the body framework and walls as distinguished from the organs contained inside the body.  5-S Attorneys' Dictionary of Medicine 4376.

[34] Ruminative means marked by abnormal preoccupation with certain thoughts and ideas, especially of the past.  5-R Attorneys' Dictionary of Medicine 4130.

dysthymia,[35] generalized anxiety disorder, somatization disorder,[36] obsessive-compulsive disorder[37] with histrionic[38] traits, hypothyroidism, migraines, vitamin B12 deficiency, and depression.  (R. 254.)  Additionally, he diagnosed psychosocial stressors consisting of frequent separation from her spouse, loneliness, and health concerns.  (*Id.*)  Dr. Luckett concluded that Plaintiff's global assessment of functioning (GAF) was between 60 and 65.[39]  (*Id.*)

On May 25, 2001, Plaintiff telephoned Carilion to express her unhappiness with her continuing poor telephone skills, despite the physicians' treatment.  Dr. George Chaconas told her to read Dr. Luckett's report and that they would then decide whether to pursue psychiatric or further neurological consultation.  (R. 183.)  Together, Plaintiff and the doctor decided, based on her continuing telephone problems and the reports from Dr. Estronza and Dr. Luckett, that she would see a psychiatrist, Dr. Nicholas Zeltvay, D.O., and possibly a psychologist.  (R. 185-86.)

---

[35] Dysthymia is a disorder of the mood, less severe than a major depression, marked by a loss of interest in activities previously enjoyed, described by the patient as a feeling of being in the dumps, and lasting more than two years.  2-D Attorneys' Dictionary of Medicine 5402.

[36] Somatization disorder is a mental disorder characterized by multiple physical symptoms and a complicated medical history involving a variety of organs and systems of the body, but without recognizable physical changes.  5-S Attorneys' Dictionary of Medicine 4396.

[37] Obsessive-compulsive disorder is a psychiatric disorder in which the individual has regular thoughts or obsessions, as well as mental rituals such as counting objects . . . to the extent or disrupting normal thoughts.  4-O Attorneys' Dictionary of Medicine 153.

[38] Histrionic means marked by histrionism, the tendency to be dramatic, to use exaggerated gestures, to grimace, etc., as observed in hysteria, neuroses, and some psychoses.  3-H Attorneys' Dictionary of Medicine 3491.

[39] A GAF between 51 and 60 means a patient has moderate symptoms or moderate difficulty in social, occupational, or school functioning, while a GAF between 61 and 70 means that a patient has some mild symptoms or some difficulty in social, occupational, or school functioning, but is generally functioning pretty well and has some meaningful interpersonal relationships.  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders: DSM-IV 34 (4th ed., text revision, 2000).

Plaintiff sought psychiatric care from Dr. Zeltvay from June 25, 2001 until May 2, 2002.  (R. 255-69.)  On initial evaluation, Dr. Zeltvay diagnosed mood disorder not otherwise specified, generalized anxiety disorder, and cognitive dysfunction not otherwise specified.  (R. 269.)  He found that Plaintiff had a GAF of 55.  (*Id.*)  For treatment, Dr. Zeltvay switched Plaintiff's medication from Zoloft to Effexor, in order to take advantage of the latter's dual application in treating depression and anxiety.  (*Id.*)  Plaintiff continued to report confusion and difficulty with using the phone, holding conversations, and recalling names.  (R. 260-63.)  On March 5, 2002, Dr. Zeltvay added Ritalin to Plaintiff's medications.  (R. 259-60.)  In his final evaluation on May 2, 2002, Dr. Zeltvay noted that Plaintiff was psychiatrically stable with a GAF of 75.[40]  (R. 256.)

On June 18, 2002, Jerome S. Nichols, Ph.D., a psychologist, saw Plaintiff for a consultative mental status evaluation, at the request of the state agency.  (R. 293-96.)  After performing a mental status examination, Dr. Nichols found that claimant had a rather spotty fund of general knowledge[41] but that her memory for short-term and long-term events seemed relatively unimpaired.  (R. 294.)  Also, Dr. Nichols observed no evidence of a psychotic disorder, nor of an obsessive-compulsive disorder .  (R. 294-95.)  Dr. Nichols observed that Plaintiff often took a long time in responding to questions, had nothing unusual about her speech, made good eye contact, was friendly and cooperative, and was tearful at times.  (R. 295.)  Due to two errors she made on the

---

[40] A GAF between 71 and 80 means that if symptoms are present, they are transient and expectable reactions to psychosocial stressors and that there is no more than slight impairment in social, occupational, or school functioning.  American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders: DSM-IV</u> 34 (4th ed., text revision, 2000).

[41] For example, Plaintiff could not correctly identify the number of weeks in a year nor the continent where Brazil is located.  (R. 294.)

serial sevens task,[42] Dr. Nichols concluded that Plaintiff had moderate concentration problems.  (*Id.*)  Dr. Nichols further opined that Plaintiff appeared to be functioning in the low average range of intelligence and that she seemed capable of managing her funds. (*Id.*)  Dr. Nichols diagnosed a depressive disorder, not otherwise specified.  (R. 296.) Additionally, he noted some hysterical[43] qualities about Plaintiff's symptoms and thought it would be desirable to rule out a conversion disorder.[44]  (*Id.*)

As to Plaintiff's functioning, Dr. Nichols found that she had a GAF of 58.  (R. 296.)  Further, he opined that she seemed able to perform detailed and complex tasks, to maintain regular attendance in the workplace, to perform work activities on a consistent basis, and to accept instructions from supervisors.  (*Id.*)  Dr. Nichols also found that Plaintiff would not require special or additional supervision to perform work activities and that her mental disorder would not cause interruptions in a normal workday or workweek.  (*Id.*)  However, Dr. Nichols did conclude that Plaintiff has a mild impairment in interacting with co-workers and the public, and a moderate impairment in coping with the usual stresses encountered in competitive work.  (*Id.*)

The record also contains two Psychiatric Review Technique forms (R. 276-92, 315-29) and one Mental Residual Functional Capacity Assessment form (R. 330-32), all

---

[42] The serial sevens task involve subtracting seven from 100 (one-hundred) and then subtracting seven from the resulting difference and, thereafter, from each subsequent difference.  (R. 295.)

[43] Hysterical means affected by hysteria; of the nature of hysteria; or pertaining to hysteria.  3-H Attorneys' Dictionary of Medicine 6127.  Hysteria is a type of mental condition, technically a psychoneurosis, in which exaggerated emotions become transformed into physical manifestations, as overactive motions or perverted (distorted) sense impressions.  3-H Attorneys' Dictionary of Medicine 6121.

[44] Conversion disorder is the same as conversion hysteria.  2-CH-CZ Attorneys' Dictionary of Medicine 5527.  Conversion hysteria is a form of hysteria or psychoneurosis in which physical signs and symptoms are substituted for anxiety.  2-CH-CZ Attorneys' Dictionary of Medicine 5528.

of which were completed by non-examining psychologists employed by the state agency.

In the first Psychiatric Review Technique, completed on February 26, 2002, Dr. Howard Leizer found that Plaintiff suffered from an organic mental disorder.[45]  (R. 276.) He opined that Plaintiff's impairment caused only mild restriction of activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation.  (R. 286.)

In the second Psychiatric Review Technique, completed on July 1, 2002, Dr. R.J. Milan, Jr., found that Plaintiff suffered from an affective disorder.[46]  (R. 315.)  He opined that this disorder resulted in mild restriction of activities of daily living, mild difficulties in social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation.  (R. 325.)  Dr. Milan also completed the Mental RFC Assessment in which he found Plaintiff was not significantly limited in most of the required work functions.  (R. 330-32.)  He found Plaintiff moderately limited only in the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; and the ability to maintain attention and concentration for extended periods.  (R. 330-31.)  Dr. Milan concluded that Plaintiff could understand, remember, and carry out at least simple work instructions under ordinary supervision, with some

---

[45] An organic mental disorder is an organic brain syndrome the cause of which is known to be a pathological alteration of the brain, as Alzheimer's disease.  4-O Attorneys' Dictionary of Medicine 1955. An organic brain syndrome is a mental disorder resulting from (or at least associated with) a discernible alteration in the normal anatomical (or histological) structure of the brain.  4-O Attorneys' Dictionary of Medicine 1945.

[46] An affective disorder is any severe mental disorder marked by periods of extreme depression or elation.  It dominates the mental life of the subject and is responsible for loss of contact with his environment.  The swings of mood (from depression to elation or from elation to depression) do not seem to be initiated by external events.  1-A Attorneys' Dictionary of Medicine 3429.

difficulty concentrating for lengthy periods.  (R. 332.)  Additionally, he concluded that she could persist at work routines, relate appropriately with others, adapt self-sufficiently in a work setting, and sustain activities on a regular, continuing basis.  (*Id.*)

Subsequent medical records disclose that Plaintiff sought general medical treatment from Dr. Jim Dickert, D.O.  (R. 366-80.)  His records reflect that, on November 4, 2003, he referred Plaintiff to a Dr. Gurnani for treatment of her mental conditions.  (R. 367.)  Although Plaintiff has filed ten (10) pages of mostly handwritten notes,[47] these records are not part of the administrative record and, therefore, were not considered by the ALJ in reaching her decision.  The newly filed documents show another diagnosis of depression, anxiety, and cognitive deficits, upon initial examination on November 3, 2003.  Notes from February 9, 2004 state that Plaintiff was feeling slightly better at that time.  In later notes, dated April 5, 2004, it is revealed that Plaintiff's main stressor was her husband, who was often angry.  The most recent notes filed by Plaintiff, dated May 6, 2004, show Plaintiff continued to complain of her inability to effectively utilize the telephone and to conduct a conversation thereon.

After reviewing the evidence, including Plaintiff's testimony and portions of the medical records, the ALJ determined that Plaintiff suffered from degenerative disc disease of the cervical spine, migraine headaches, an affective disorder, hypertension, and hypothyroidism, of which the latter two impairments were controlled by medication. (R. 17.)  The ALJ concluded that these impairments were severe within the meaning of

---

[47] See Doc. 14, Attachment 1.  Although it is unclear who created these documents, the Court presumes it was Dr. Gurnani to whom Plaintiff was referred by Dr. Dickert.

the regulations but not severe enough to meet or medically equal those listed in

Appendix 1, Subpart P of Social Security Regulation number 4.  (*Id.*)

The ALJ next found that Plaintiff retained the physical RFC to frequently lift up to

25 pounds, occasionally lift up to 50 pounds, and walk, stand, or sit for about six hours

per eight-hour workday.  (R. 18.)  The ALJ adopted the findings of the two state agency

reviewing psychologists that Plaintiff's mental impairments caused only mild restriction

of activities of daily living, mild difficulties in social functioning, and moderate limitations

in concentration, persistence, or pace.  (*Id.*)  However, the ALJ rejected the finding of

one of those same state agency psychologists that Plaintiff would have some difficulty

concentrating for lengthy periods.  (R. 18, 332.)  Instead, the ALJ adopted the finding of

Dr. Nichols, the consultative examiner hired by the agency, that Plaintiff's mental

disorder would not cause interruptions in a normal workday or workweek.  (R. 18, 296.)

Based on her RFC finding, the ALJ concluded that Plaintiff could perform her past

relevant work as a full-time data entry clerk.  (R. 18.)  In reaching her conclusion, the

ALJ found that Plaintiff's allegations regarding her limitations were not totally credible.

(R. 17-19.)

## V.  DISCUSSION

Plaintiff contends that the ALJ committed legal error by not considering properly

Plaintiff's mental impairments.  Specifically, Plaintiff alleges that the ALJ improperly

gave more weight to the opinions of reviewing and consulting psychologists than she

gave to Plaintiff's treating psychologists and psychiatrists.  Additionally, Plaintiff argues

that the ALJ failed in her affirmative legal duty to fully and fairly develop the record by

not obtaining an updated consultative psychological examination.  In response, the

16

Commissioner argues that the record was sufficient for the ALJ to reach her decision. For the reasons discussed below, the Court concludes that the ALJ erred in her consideration of the opinions of Plaintiff's treating physicians.

It is well established that substantial or considerable weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless "good cause" is shown to the contrary.[48]  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.[49]

The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.[50]  Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.[51]

When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on: (1) the length of the treatment

---

[48] Crawford v. Commissioner of Social Security, 363 F. 3d 1155, 1159 (11th Cir. 2004) (citing Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir.1997)) ("We have found 'good cause' to exist where the doctor's opinion was not bolstered by the evidence, or where the evidence supported a contrary finding. We have also found good cause where the doctors' opinions were conclusory or inconsistent with their medical records.").  See also Edwards, 937 F.2d at 583-584; Sabo v. Commissioner of Social Security, 955 F. Supp. 1456, 1462 (M.D. Fla.1996); 20 C.F.R. § 404.1527(d).

[49] 20 C.F.R. § 404.1527(d)(2).

[50] Edwards, 937 F.2d at 584 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).

[51] Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir.1986); see also Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir.1987).

relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the medical evidence supporting the opinion; (4) consistency with the record a whole; (5) specialization in the medical issues at issue; and (6) other factors which tend to support or contradict the opinion.[52]   However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.[53]

Upon a review of the ALJ's decision, as well as an examination of the medical records at issue, the Court determines that the ALJ failed to properly consider the opinions of Plaintiff's treating mental health care providers.  The ALJ partially discounted the opinions of Dr. Luckett without explanation and wholly failed to consider, or even acknowledge, the opinions and evidence from Dr. Zeltvay, one of Plaintiff's treating psychiatrists.  Both Dr. Luckett and Dr. Zeltvay diagnosed numerous psychiatric disorders.  Because the ALJ did not explicitly discount the findings of these two physicians, nor even discuss their opinions or the weight, if any, to be granted to these opinions, the Court cannot make meaningful review of whether the ALJ considered this evidence.

Although, the ALJ did describe the diagnosis from Dr. Luckett of dysthymia, generalized anxiety disorder, somatization disorder, and obsessive-compulsive disorder (R. 16) she did not include any of these impairments in the list of impairments that the ALJ contended Plaintiff suffered.  Instead, the ALJ included among the impairments an

---

[52] 20 C.F.R. § 404.1527(d).

[53] Wilson v. Heckler, 734 F.2d 513, 518 (11th Cir.1984); see also 20 C.F.R. § 404.1527(d)(2).

affective disorder, apparently based on the opinion of a single non-examining physician, contained in a Psychiatric Review Technique.  (R. 17, 315-18.)

In finding Plaintiff's RFC, the ALJ failed to include any limitations suggested by Dr. Luckett's opinions and instead relied on the opinions of the state agency's reviewing physicians and Dr. Nichols, who performed a consultative examination.[54]  (R. 18.)

With regard to Dr. Zeltvay's psychiatric treatment of Plaintiff, the ALJ did not even mention the treatment or findings of Dr. Zeltvay. (R. 255-69.)  As Plaintiff is alleging her mental impairments prevent her from working, the ALJ was required to either give substantial weight to the medical evidence generated by Plaintiff's treating psychiatrist or articulate adequate reasons for discounting that evidence. The ALJ failed to do either. Rather, the ALJ's failure to acknowledge Dr. Zeltvay's records suggests that the ALJ accorded them no weight in reaching her decision, without any discussion or explanation.

The failure of the ALJ to either accord substantial weight to the opinions of Dr. Luckett and Dr. Zeltvay or to discuss her reasons for discounting those opinions is legal error. Accordingly,  this matter is due to be reversed and remanded to the Commissioner for proper consideration of the opinions of these treating physicians.  On remand, the Commissioner should either give substantial weight to the opinions, diagnoses, and medical records of Dr. Luckett and Dr. Zeltvay or articulate good cause

---

[54] Additionally, the ALJ did not even totally credit the opinion of consultant Dr. Nichols, as she also failed to include any of the limitations found in his report.  Dr. Nichols found that Plaintiff had mild impairment in interacting with co-workers and the public and moderate impairment in coping with the usual stresses encountered in competitive work.  (R. 296.)

for discounting their opinions, diagnoses, and medical records, in accordance with the law of the Eleventh Circuit.

As the Court has determined that reversal is warranted because of the failure to consider the treating physician evidence from Dr. Luckett and Dr. Zeltvay, the Court will only comment briefly on the other issues raised by Plaintiff in her brief.

Plaintiff argues that the ALJ failed to weigh appropriately the records of her treating physician, Dr. Dickert. While Dr. Dickert may have become Plaintiff's primary care physician, the medical evidence he provided discloses little about the mental impairments about which Plaintiff's claim of disability is based. Thus, if the ALJ failed to give Dr. Dickert's evidence the appropriate weight, such failure is irrelevant as it has little to do with the issue of Plaintiff's alleged mental impairment.

Plaintiff also argues that this case should be remanded for the ALJ to consider documents generated during Plaintiff's treatment by Dr. Gurnani. As noted above, Plaintiff filed these documents with the Court, but they are not evidence of record in this case because they were never submitted to the agency. In order to justify a remand based on new evidence, Plaintiff must show both "that there is 'good cause' for her failure to offer the evidence at the administrative level and that there is a reasonable possibility that the evidence would change the outcome."[55] Assuming that Plaintiff's alleged lack of ability to cooperate with counsel represents good cause, Plaintiff has wholly failed to show a reasonable probability that Dr. Gurnani's documentation would

---

[55] <u>Cherry v. Heckler</u>, 760 F.2d 1186, 1192 (11th Cir. 1985) (citng 42 U.S.C. § 405(g); <u>Wright v. Heckler</u>, 734 F.2d 696, 697 (11th Cir. 1984) (per curiam); <u>Allen v. Schweiker</u>, 642 F.2d 799, 802 (5th Cir. Unit B 1981) (per curiam)).

change the outcome of the case if introduced in evidence.  Therefore, remand on the grounds of newly discovered evidence is inappropriate.

Finally, Plaintiff also argues that the ALJ failed to fully develop the record by not ordering a consultative psychological examination to update the one conducted by Dr. Nichols.  It is well settled that an ALJ has a basic obligation to fully and fairly develop the record.[56]  As a hearing before the Social Security Administration is non-adversarial in nature,[57] the duty to develop the record is triggered when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence.[58]

Here, Plaintiff argues only that the evidence from Dr. Nichols, and earlier evidence from psychiatrists and psychologists, is "outdated," with no explanation of why or how that is so.  For example, Plaintiff did not argue that her condition has changed since the date of the latest evidence of record.  Plaintiff has shown neither that the evidence in this case is ambiguous nor that the record is inadequate to allow for proper evaluation of the evidence.  Accordingly, the Court cannot find that the ALJ failed to fully and fairly develop the record in this case.

## VI.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **REVERSED and REMANDED** under sentence four of 42 U.S.C.

---

[56] See Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981); see also Zaldivar v. Apfel, 81 F. Supp. 2d 1353, 1359 (N.D. Ga. 2000).

[57] Zaldivar, 81 F. Supp. 2d at 1359.

[58] See Mason v. Barnhart, 63 Fed. Appx. 284, 2003 WL 1793283, *2 (9th Cir. 2003).

§ 405(g) to the Commissioner, for an Administrative Law Judge to: (1) properly consider the opinions of Plaintiff's treating physicians and either give those opinions substantial weight, or articulate good cause for not giving the treating physicians' opinions such weight; and (2) conduct any additional proceedings the Commissioner deems appropriate.

**IN CHAMBERS** in Ocala, Florida, on July 5, 2005.

_____
GARY R. JONES
United States Magistrate Judge

Copies to:
    The Honorable Wm. Terrell Hodges
    Senior United States District Judge

    All Counsel